UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAVENNA TANKERS PTE., SRL                    CIVIL ACTION

VERSUS                                        NO: 13-127 c/w 13-
                                              221

OMNI SHIPS PTE. LTD                           SECTION: J (3)

THIS DOCUMENT RELATES TO:
13-221

## ORDER AND REASONS

Before the Court is Morfini SpA's ("Morfini") Ex Parte Motion for Issuance of Maritime Law Rule B Writs of Attachment and Garnishment, Rule C Warrant of Arrest, and Louisiana State Law Writs of Attachment, Sequestration, and Garnishment and to Appoint Undersigned Counsel to Serve Same.   (Rec. Doc. 42.)[1]   Briefly stated, Morfini seeks to arrest, attach, garnish, and/or sequester certain funds previously deposited in the Court's registry.   For the reasons set forth below, the Court **GRANTS** Morfini's motion with respect to its requests under Admiralty Rules C and B, and **DENIES WITHOUT PREJUDICE** Morfini's motion with respect to its requests for the Louisiana writs.

## I. BACKGROUND AND PROCEDURAL HISTORY

These consolidated actions (Nos. 13-127 & 13-221) arise from

---

[1]  This motion was originally filed in case no. 13-221 as Record Document 2.   That case was later consolidated with case no. 13-127, and the motion was refiled into the master case, 13-127, as Record Document 42.   Unless otherwise noted, all docket citations are to the master case, no. 13-127.

1

a charter party chain concerning the M/T ELECTA, an Italian-flagged, 600 ft., oil and chemical tanker owned by Morfini. On or around October 23, 2009, Morfini entered into a time charter with Ravenna Tankers Pte., Srl. ("Ravenna") on an amended Shelltime 4 Form wherein Ravenna agreed to hire the ELECTA at a rate of $13,165 per day ("the Morfini/Ravenna Head Charter").[2]  Around September 21, 2010, Ravenna subchartered the ELECTA to Omni Ships Pte., Ltd. ("Omni" and "the Ravenna/Omni Subcharter").[3]  The Ravenna/Omni Subcharter was nearly identical to the Morfini/Ravenna Head Charter, with the only relevant exception being that Omni paid Ravenna $13,600 per day to hire the ELECTA. Omni then sub-subchartered the ELECTA to another party, Vitol ("the Omni/Vitol Sub-subcharter").[4]

---

[2] A charter party is a contract for the use of a ship. While many variants exist, there are three general types of charter arrangements: time charter, voyage charter, and demise (or bareboat) charter. Under a time charter, the charterer engages the vessel for a period of time. The charterer typically selects the vessel's destinations and the cargo to be transported, but does not have operational control of the vessel. The vessel owner typically retains control of the vessel, provides the crew, and maintains the vessel. The charterer pays "hire" to the owner based on the time under charter and usually bears the expenses connected with the voyage (e.g., fuel and port charges). The parties typically use one of the standardized forms as the basis for their contract, as the parties did here with the Shelltime 4 Form. See 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-1, 11-5 (5th ed. 2011).

[3] Omni was formerly known as Siba Ships Asia Pte., Ltd., which is the name that appears on Ravenna/Omni Subcharter.

[4] The Court refers to Omni's subcharterer as "Vitol," but this may not be accurate. The specifics of the charter party chain beyond the Ravenna/Omni Subcharter are not entirely clear to the Court at this time. For example, Morfini represents that Omni subchartered to "Navig8," as opposed to Vitol. (See Morfini's Compl. ¶ 11, No. 13-221, Rec. Doc. 1 (stating Omni subchartered to Navig8, without reference to Vitol or any other entities); Decl. of Julian Clark ¶ 6, Ex. A to Morfini's Suppl. Memo., Rec. Doc. 37 at 18 (same). But see Ex. 4 to Morfini's Compl., No. 13-221, Rec. Doc. 1-1 at 35-40 (notice of lien letters stating Omni subchartered to Vitol, who sub-subchartered to Navig8, who entered

Clause 41 in the Morfini/Ravenna Head Charter provides:  "This charter shall be construed and the relations between the parties determined in accordance with the laws of England."  Additionally, Clause 89 states, in pertinent part:  "All disputes or differences arising out of or under this contract that cannot be amicably resolved shall be referred to arbitration in London.  . . . English law governs this contract and this shall apply to all proceedings under this clause . . . ."   Identical clauses appear in the Ravenna/Omni  Subcharter  and,  according  to  the  parties,  the Omni/Vitol Sub-subcharter.

At some point, disputes arose among these parties over amounts purportedly owed under the various charter arrangements.  From what has been represented to the Court, it appears that Vitol did not pay certain amounts in hire and/or other expenses allegedly owed to Omni under the Omni/Vitol Sub-subcharter  (perhaps because Vitol was owed amounts from others further down the charter party chain). Apparently as a result of Vitol's nonpayment, Omni, in turn, did not  pay  certain  amounts  allegedly  owed  to  Ravenna  under  the Ravenna/Omni Subcharter; and Ravenna, in turn, did not pay certain amounts allegedly owed to Morfini under the Morfini/Ravenna Head Charter.[5]  Consequently,  on  or  around  February  8,  2012,  Morfini

into a voyage charter with Pacific Inter Link); Omni's Opp'n Br. p.2, No. 13-127, Rec. Doc. 34 (claiming Omni subchartered to "Mansel Ltd./Vitol Services, Ltd.").) However, such specifics do not appear relevant to the motion before the Court.

    [5] This is a general and perhaps overly-simplified description of the disputes.

3

commenced arbitration proceedings in London against Ravenna pursuant to Clause 89 in the Head Charter. Ravenna similarly commenced London arbitration against Omni, who also commenced London arbitration against Vitol. It appears that all of these arbitrations are running concurrently before the same panel.[6]

On January 23, 2013, Ravenna instituted proceedings in this Court to attach Omni's ship, the M/V STELLA BECRUX (not to be confused with Morfini's ship, the ELECTA), pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims ("Admiralty Rule B" or simply "Rule B"). (Rec. Docs. 1, 3.) Ravenna's goal was to obtain security for its claim against Omni pending in the London arbitration (which it estimates to be between $899,629.21 and 994,560.69); the parties agree that this Court will not decide the merits of Ravenna's claim.[7] On January 24, the writ of attachment issued, and the marshal seized the STELLA BECRUX the next day. (Rec. Docs. 5, 6, 25.) Because the parties could not agree on the amount of security required for the release of the

---

[6] Morfini represents that, on June 13, 2012, the arbitration panel ordered that these three arbitrations would "run concurrently," which means that documents produced or submitted in one proceeding are made available in the other proceedings. Also, arbitrators will issue awards for each of the proceedings at the same time, comprehensively resolving the overall dispute among the parties. (See Decl. of Julian Clark ¶13, Ex. A to Morfini's Suppl. Memo., Rec. Doc. 37 at 20.) No party appears to dispute these statements.

[7] "Section 8 [of the Federal Arbitration Act, 9 U.S.C. § 8] gives the 'aggrieved party' in a case subject to arbitration the important right to go into court and obtain prejudgment security by seizing the other party's vessel or other property. The provision applies only to cases that otherwise would be justiciable in admiralty, and its purpose is to give the plaintiff his admiralty remedies while preserving the right to arbitrate." Schoenbaum, supra note 2, § 21-15, at 598.

vessel (Omni calculated Ravenna's claim to be only $110,079.61), the Court, pursuant to Admiralty Rule E(5), set security at $800,000.   (Minute Entry, Rec. Doc. 20.)   On January 31, Omni deposited $800,000 in the Court's registry, and the STELLA BECRUX was released. (Rec. Doc. 24.)

On February 6, 2013, Morfini also attempted to obtain security for its claims pending in the London arbitration.   Morfini instituted a separate action, No. 13-221, that brought in personam claims against Ravenna **and** Omni, as well as an in rem claim against the $800,000 Omni had deposited in the Court's registry.   (No. 13-221, Rec. Doc. 1.)   Morfini's complaint states that it is owed $717,701.74 in unpaid charter hire and other expenses due under the Morfini/Ravenna Head Charter, plus another $335,395.48 for estimated interest, costs, and attorney fees that are available under English law, for a total of $1,053,097.22. (No. 13-221, Rec. Doc. 1 ¶ 24.)   Contending, *inter alia*, that a clause in the Morfini/Ravenna Head Charter gave it a lien over all "freights, sub-freights, sub-hires and demurrage for any amounts due under [the Head Charter]," Morfini sought to attach the $800,000 under Admiralty Rule B and arrest the $800,000 under Admiralty Rule C. Morfini also sought to attach, sequester, and garnish the funds under certain Louisiana laws.   <u>See</u> La. Code Civ. Proc. arts. 3541(5),   3571, 3503.   Morfini's action, Case No. 13-221, was

eventually consolidated with the Ravenna/Omni case, No. 13-127.[8]

Typically, Rule B and Rule C are ex parte procedures. The Court must review the complaint and supporting documentation and, if the requisite conditions appear to exist, enter an order instructing the Clerk of Court to issue the writ of attachment and/or garnishment or warrant for arrest. See Fed. R. Civ. P. Supp. R. B(1)(b) & C(3)(a)(i). In an order dated February 13, 2013, the Court stated it was unclear from Morfini's documents whether the conditions for arrest, etc., existed. Consequently, the Court deferred ruling on Morfini's request for arrest, etc., of the $800,000 and directed Morfini to submit additional briefing on four issues, including:

> Whether the $800,000 deposited with the Court should be considered the "freights, sub-hires, sub-hires and demurrage for any amounts due under this charter" over which Ravenna claims to assert a maritime lien (see Paragraph 26 of the Morfini-Ravenna charter party), given that the $800,000 is, at present, a substitute *res* for Omni's vessel? Stated another way, . . . assuming Morfini could not assert a maritime lien against and arrest Omni's vessel under Rule C, can Morfini now assert a maritime lien against funds that merely take the place of the vessel? Likewise, the Court also requests that Morfini generally explain the law governing liens and/or maritime liens over hires, freights, sub-hires, and sub-freights.

(Rec. Doc. 31.) The February 13th order also invited Ravenna and Omni to submit additional briefing. Morfini and Omni submitted

---

[8]   On February 8, Morfini also moved to intervene into the Ravenna/Omni case in order to assert identical relief. (Rec. Doc. 27.) That motion is before the Magistrate Judge.

supplemental briefs; Ravenna did not.   (Rec. Docs. 37, 34.)
Morfini also submitted a reply brief.  (Rec. Doc. 41.)  Notably,
Omni's brief did not directly address the issue quoted above.

## II. DISCUSSION

As mentioned, Morfini's motion invokes Rule C, Rule B, and
Louisiana law.   Because the Court finds Morfini may arrest the
funds under Rule C and attach the funds under Rule B, it does not
address Louisiana law.

## A.   Conflicts of Law

The Court must briefly address a conflicts-of-law issue.[9]
Under Clause 41 and Clause 89 in both the Morfini/Ravenna Head
Charter and the Ravenna/Omni Subcharter (quoted above), it would
appear that the question of whether Morfini holds a maritime lien
over the $800,000 in the Court's registry—and consequently whether
Morfini may proceed in rem under Rule C, as explained below—is
determined by English law.   Cf. Sembawang Shipyard, Ltd. v.
Charger, Inc., 955 F.2d 983, 985-86, 988 (5th Cir. 1992)(where
contract stated, "[a]ny dispute shall be determined according to
the Arbitration Ordinance 1963" and "[t]he contract shall be

---

[9] It is not uncommon for such issues to arise in maritime seizure cases.
See Martin Davies, Choice of Law and U.S. Maritime Liens, 83 Tul. L. Rev. 1435,
1435-36 (2009) ("Because of the international nature of the shipping business,
it is often the case that U.S. courts are required in consequence to consider in
rem actions brought by foreign claimants seeking recovery in claims governed by
foreign law. The attractiveness of U.S. courts as a forum for in rem claims is
enhanced by the fact that far more claims are secured by a maritime lien under
U.S. law than under the law of other countries."); Schoenbaum, supra note 2, §
21-3, at 543.

governed by the Law of Singapore," the issue of whether a maritime lien existed was determined by Singapore law—despite the fact that the vessel was arrested in the United States—and because plaintiff's claim did give rise to a maritime lien under Singapore law, plaintiff could not proceed under Rule C).[10]

Nevertheless, it is the parties' burden to establish with reasonable certainty the substance of foreign law; otherwise, the Court  may apply the law of the forum. <u>Banco de Credito Industrial, S.A. v. Tesoreria General de la Seguridad Social de Espana</u>, 990 F.2d 827, 836 (5th Cir. 1993); <u>In re Avantel, S.A.</u>, 343 F.3d 311, 321-22 (5th Cir. 2010) (non-maritime case); <u>accord Cooper v. Meridian Yachts, Ltd.</u>, 575 F.3d 1151, 1165-66 (11th Cir. 2009). Although Omni urges that English law governs this matter, including the existence *vel non* of a maritime lien, Omni never explains, much less establishes, the substance of English law on this topic. (Omni's Opp'n p. 5, Rec. Doc. 34.)  More to the point, Omni's brief does not address—under any law—the law regarding maritime liens over subfreights, etc., despite the fact that the Court specifically identified this issue in its February 13, 2013 Order.

---

[10]   The case law is unclear as to whether English law would also determine whether Morfini holds a prima facie valid maritime claim against Omni, one of the prerequisites for Rule B attachment. <u>Compare</u> <u>Al Fatah Int'l Navigation Co. v. Shivsu Canadian Clear Waters Tech. (P) Ltd.</u>, 649 F. Supp. 2d 295, 299-300 (S.D.N.Y. 2009) (Rule B attachment is determined by the law governing underlying claim), <u>with</u> <u>SLS Shipbuilding Co. Ltd. v. Ionia Mgmt. S.A.</u>, No. H-11-271, 2011 WL 2652365, at *4 (S.D. Tex.  July 5, 2011) ("whether a claim is considered maritime for purposes of Rule B is a question of federal law").  The Court need not address this issue, however, because no party has established with reasonable certainty the substance of English law, as explained below.

Morfini, on the other hand, does discuss maritime liens over subfreights, but it asserts that U.S. law, not English law, governs this issue, and, consistent with this contention, cites only U.S. cases.  (See Morfini's Suppl. Memo. pp.12 -13, Rec. Doc. 37; Morfini's Suppl. Reply Br. p.6, Rec. Doc. 41.)  While Morfini's argument that English law does not apply appears suspect, it need not be addressed at this time.  At bottom, no party has established with reasonable certainty the substance of English law respecting maritime liens and subfreights, much less that English law would be different from U.S. law.[11]  Therefore, the Court will apply the law of the forum, the United States.

---

[11]  Morfini alternatively argues that, "[t]o the extent English law would apply, however, the earlier submitted, and uncontroverted, Declaration of Julian James Clark [Morfini's English solicitor] makes clear at paragraph 16 that 'Morfini's service of notice on the parties down the chartering chain was effective, under English law [(called for by the Morfini/Ravenna and Ravenna/Omni Charters)], to exercise Morfini's lien rights.'"  (Rec. Doc. 41 at 6.)  Normally, an un-rebuffed affidavit from an attorney is sufficient to establish the substance of foreign law.  Cooper, 575 F.3d at 1165-66.  However, Morfini's declarant provides no support for his statement.  See id.  Also, while the declaration states that there was an "effective . . . exercise [of] Morfini's lien rights," this is arguably not the same as saying Morfini held a "*maritime* lien" under English law that would permit it to proceed under Rule C.  Cf. Sembawang Shipyard, Ltd., 955 F.2d at 988 (explaining that a statutory right to proceed in rem under English and Singapore law is not necessarily the same as holding a maritime lien for purposes of Rule C); Schoenbaum, supra note 2, § 21-3, at 543.  Consequently, the Court will not reach a conclusion that the declarant does not plainly express.  Finally, while Morfini's brief argues against the application of English law, its declarant openly states that English law does apply.  This contradiction raises suspicion about the motive behind Morfini's current resistance to English law, particularly when considered with the fact that Morfini previously embraced English law when it ostensibly served Morfini's purpose.  (See Morfini's Compl. ¶ 23, No. 13-221, Rec. Doc. 1 (seeking interest, costs, and attorney fees under English law)).  For these reasons, the Court finds that this declaration fails to established the substance of English law with reasonable certainty.  Of course, it is unlikely that Morfini will be disappointed with this result, given that the consequence is that the Court will apply United States law, which is the law Morfini seems to prefer here.

**B.   Rule C**

Morfini admits that it held no maritime lien against Omni's vessel, the STELLA BECRUX and, therefore, could not have arrested it under Rule C. (Morfini's Suppl. Memo. p. 9 n.2, Rec. Doc. 37.) Despite this, Morfini maintains that Clause 26 in the Morfini/Ravenna Head Charter gave it a lien against subfreights[12] for amounts owed under the Head Charter, and thus provides the basis for its in rem claim against the $800,000 deposited by Omni into the Court's registry.   Clause 26 provided, "Owners [Morfini] shall have a lien upon all cargoes and all freights, sub-freights, sub-hires and demurrage for any amounts due under this charter . . . ." (Ex. 1 to Morfini's Compl., No. 13-221, Rec. Doc. 1-1 at 7 (emphasis omitted).)  Morfini further asserts that it perfected its lien on January 22, 2013 by sending letters to Omni (as well as the other parties further down the charter party chain) stating that it was exercising its lien rights.  (Ex. 4 to Morfini's Compl., No. 13-221, Rec. Doc. 1-1 at 35-40.)  Morfini adds that Ravenna's claims against Omni for amounts owed under the Ravenna/Omni Subcharter are substantially the same as the expenses and hire that

---

[12] From the vessel owner's perspective, "subfreights" generally refers to compensation paid to someone other than the owner for the carriage of goods or the hire of the vessel; e.g., subhire owed to a charterer from a subcharterer, or freight that is owed to the charterer under a bill of lading or voyage charter.  See Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550, 556 (5th Cir. 2004); Cornish Shipping Ltd. v. Int'l Nederlanden Bank N.V., 53 F.3d 499, 502 (2d Cir. 1995).  Thus, the amount Omni allegedly owes under the Ravenna/Omni Subcharter is, from Morfini's perspective, considered "subfreight," even though it might be more accurate to call these amounts "subhire."

Morfini seeks under the Morfini/Ravenna Head Charter, minus Ravenna's higher charter rates.

Again, Omni has not directly addressed the law regarding maritime liens over subfreights. Instead, Omni's primary argument is that no contract existed between Morfini and Omni, therefore, Morfini has no claim against Omni, nor any maritime liens against Omni's property.

Under United States law, the ability to invoke Rule C's in rem remedy typically depends on the existence of a maritime lien; the warrant for arrest is issued to foreclose and enforce a maritime lien. Schoenbaum, supra note 2, § 21-3, at 539-40; see also Fed. R. Civ. P. Supp. R. C(1), (3)(a)(i)[13]; Sembawang Shipyard, 955 F.2d at 987 ("In contrast [to Rule B, which is an adjunct to a claim in personam], Supplemental Rule C is a true proceeding in rem. The claim is against the thing itself. . . . Traditionally, the plaintiff must hold a maritime lien." (citation omitted)). Although the property to be arrested usually is a vessel, any property that is subject to a maritime lien can be arrested,

---

[13] Rule C provides, in pertinent part:

An action in rem may be brought:
   (a) To enforce any maritime lien;
   (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.
. . .
The Court must review the complaint and any supporting papers. If the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for the arrest of the vessel or other property that is the subject of the action.

Fed. R. Civ. P. Supp. R. C(1), (3)(a)(i).

including intangible property such as subfreights. See Schoenbaum, supra note 2, § 21-3, at 540 & n.14 ("*In rem* proceedings against intangible property are almost always to enforce a lien against subfreights for the payment of hire due under a charter party."); *see also* Fed. R. Civ. P. Supp. R. C(3)(b)(ii), (3)(c) (governing service under Rule C for different types of property, including intangible property); Fed. R. Civ. P. Supp. R. C, Advisory Committee Notes on 1966 Adoption, Subdivision (3) (discussing situations "where the owner of a vessel under charter has a lien on subfreights").

While maritime liens are distinct—some might say peculiar—from traditional "land liens," see, e.g., Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 9-1 to 9-2 (2d ed. 1975), the subfreight lien is peculiar even among maritime liens. See, e.g., Raymond P. Hayden & Kipp C. Leland, The Uniqueness of Admiralty & Maritime Law: The Unique Nature of Maritime Liens, 79 Tul. L. Rev. 1227, 1232 (2005) ("Probably the maximum extent of a court's in rem jurisdiction arises in certain vessel charter situations, where such an intangible as the debt of a cargo owner (for unpaid freight) can be sued in rem."). The lien does not automatically arise by operation of law, as do many other maritime liens; rather, it is a creature of contract that arises from an express provision in the charter party between vessel owner and charterer. Lykes Lines Ltd. v. M/V BBC Sealand, 398 F.3d 319, 323 (5th Cir. 2005);

12

Gilmore & Black, <u>supra</u> § 9-20, at 623 n.103.  Once perfected, the

lien is enforceable against a party that is not in privity with the

vessel owner, such as a subcharterer.  <u>See</u> <u>Biehl & Co., Inc. v.</u>

<u>Apollonia Holding, Inc.</u>, 693 F. Supp. 457, 465 (E.D. La. 1988).

The Fifth Circuit has explained:

> Shipowners, as a general rule, have a lien upon the cargo
> owned by the charterer for compensation not yet paid. .
> . . In contrast, when the cargo is not owned by the
> charterer, a shipowner generally does not have a lien on
> the cargo. The charter between the shipowner and the
> charterer, however, may provide for a lien on any
> freights owed by the cargo owner to the charterer.
> Indeed, two general conditions are necessary for a
> shipowner to maintain a lien against such a third person.
> First, the shipowner must have a contractual right to
> assert the lien; second, the shipowner must properly
> perfect the lien.
> . . .
> The lien provision, as it appears in most form charters,
> is usually phrased as: "the owners [meaning the owners of
> the vessel] shall have a lien upon all cargoes and *all
> subfreight* for charter money due under this charter."

<u>Chembulk Trading LLC v. Chemex Ltd.</u>, 393 F.3d 550, 354-55 (5th Cir.

2004) (citations omitted; some quotations and brackets omitted;

emphasis in original); <u>see also</u> <u>Lykes Lines Ltd.</u>, 398 F.3d at 323.

To perfect the lien, the vessel owner must give "actual notice" to

the third party.  <u>Lykes Lines</u>, 398 F.3d at 323.  "The cases finding

notice generally do so when the cargo owner [or subcharterer] is

notified that the vessel owner is claiming a lien, the legal basis

for the lien (the charter party agreement) and that the vessel

owner intends to enforce it by demanding payment of freights

directly to it."  <u>Id.</u> at 324.  Before such notice is given, the

lien is essentially inchoate.  Cornish Shipping Ltd. v. Int'l
Nederlanden Bank N.V., 53 F.3d 499, 502 (2d Cir. 1995).  After the
lien is perfected, if the third party pays ostensible subfreights
to the charterer, such payment will not discharge the third party's
liability to the vessel owner.  Id.

Here, Clause 26 in the Morfini/Ravenna Head Charter was
sufficient to create a maritime lien against subfreights.  Cf.
Chembulk, 393 F.3d at 555, 557 (holding that the vessel owner held
a lien over subfreights, even though the lien clause in the charter
party only referred to "all freights," as opposed to
"subfreights").  Furthermore, it appears that Morfini perfected its
lien when it sent the letters on January 22, 2013.  Notably, Omni
has not argued against either of these points.

The only question that remains at this stage is whether
Morfini's lien can attach to the funds in the Court's registry,
considering that the funds are not, at this time, subfreights per
se, but instead are the substituted res for Omni's ship.  If, as
Morfini admits, it held no maritime lien over the STELLA BECRUX,
and therefore could not arrest same, then it is arguably odd to
permit Morfini to assert a maritime lien over funds that have
merely taken the place of that ship.

In 1927, the Supreme Court encountered a roughly similar issue
in United States v. Freights, etc., of the Mount Shasta, 274 U.S.
466 (1927).  There the United States ("Owner") chartered its ship,

14

the MOUNT SHASTA, to the Mount Shasta Steamship Company
("Charterer"). Like the Morfini/Ravenna Head Charter, the contract
between Owner and Charterer stated that "'[t]he owner shall have a
lien upon all cargoes and all subfreights for any amounts due under
this charter party.'" The Mount Shasta, 291 F.92, 92 (D. Mass.
1923), rev'd, 274 U.S. 466 (1927). The Charterer then entered into
a voyage charter with the Palmer & Parker Company ("Subcharterer"),
who used the ship to transport mahogany logs from Africa to Boston.
The Owner alleged that the Charterer owed it $289,680 in charter
hire and that the Subcharterer still owed $100,000 in freight under
the subcharter. Claiming a lien over the latter amount, the Owner
brought a libel against these "freights" (i.e., brought an in rem
action against the $100,000) and sought a monition from the court
instructing the Subcharterer to deposit the $100,000 into the
Court's registry. The Subcharterer answered the libel and denied
that any amounts were due under the subcharter because it had
counterclaims against the Charterer that exceeded the $100,000;
therefore, there was no res and thus no basis of jurisdiction. The
district court agreed with this contention and dismissed the case
for lack of jurisdiction.[14] The Supreme Court, however, found that

---

[14] The district court reasoned:

   I assume, as contended by the libelant, that freight money due
   and payable constitutes a res of which an admiralty court has
   jurisdiction; but to have that effect the freight money must be
   actually due, and liability for it must, I think, either be admitted
   by the person charged, or must be so clear and obvious as to leave
   no room for bona fide denial. The mere assertion that freight is
   due from a certain person, denied in good faith by the party

in rem jurisdiction was present under those circumstances and reversed the lower court.  It explained:

> By the general logic of the law a debt may be treated as a res as easily as a ship.  It is true that it is not tangible, but it is a right of the creditor's, capable of being attached and appropriated by the law to the creditor's duties.  The ship is a res not because it is tangible but because it is a focus of rights that in like manner may be dealt with by the law. . . .

> But if it be conceded that the Admiralty Court has jurisdiction to enforce a lien on sub-freights by a proceeding in rem, and a libel is filed alleging such sub-freights to be outstanding, we do not perceive how the Court can be deprived of jurisdiction merely by an answer denying that such freights are due.  The jurisdiction is determined by the allegations of the libel.  It may be defeated upon the trial by proof that the res does not exist.  But the allegation of facts that if true make out a case entitles the party making them to have the acts tried.  It is said that the Court derives its jurisdiction from its power, and no doubt its jurisdiction ultimately depends on that.  But the jurisdiction begins before actual seizure, and authorizes a warrant to arrest, which may or may not be successful.  Here the debtor is within the power of the Court and therefore the debt, if there is one, is also within it.  The Court has the same jurisdiction to try the existence of the debt that it has to try the claim of the libellant for the hire of the Mount Shasta.  If the proof that there is freight due shall fail it does not matter very much whether it be called proof that the Court had no jurisdiction or proof that the plaintiff had no case.  Either way the libel will be dismissed.

Freights, etc., of the Mount Shasta, 274 U.S. at 470-71 (citations

---

> charged, does not, it seems to me, create a res within the jurisdiction of the admiralty court.  Such a claim might be made the basis of a suit.  But a claim is not a res in this sense. . . . The res is in the nature of a fund in controversy.  It must exist when the suit is begun or there is no foundation of jurisdiction.  And the court cannot assume that freight money is due in order to draw to itself jurisdiction to determine whether that assumption is correct.

Id. at 93.

omitted).

Under Mount Shasta's logic, Morfini's claimed lien is against a debt Omni allegedly owes to Ravenna under the Ravenna/Omni Subcharter.  Whether or not Omni actually owes anything to Ravenna will be determined by the London arbitration panel (which will also determine whether Ravenna owes anything to Morfini) , just as the determination of whether the Subcharterer in Mount Shasta owed any freight would be determined at trial.  Here, if the arbitration panel finds that Omni owes nothing under the Ravenna/Omni Subcharter, then that would mean there is no "debt" upon which Morfini's lien can attach, and the $800,000 would be released to Omni.  See Biehl & Co., Inc., 693 F. Supp. at 466 (holding that a vessel owner's lien against subfreights is limited to the amounts owed under the affeightment contract between charterer and third party); Cornish Shipping, 53 F.3d at 504 ("[E]xercise of that lien should vest the owner with the rights that the charterer would otherwise have under the contract of affeightment to proceed against that debt. . . . [H]owever, the owner does not accede to any additional rights beyond those that the charterer formerly had.").  Or as Mount Shasta put it, "If the proof that there is [sub]freight due shall fail it does not matter very much whether it be called proof that the Court had no jurisdiction or proof that the plaintiff had no case.  Either way the libel [i.e., the in rem action] will be dismissed."  274 U.S. at 471.

Under another hypothetical, if the arbitration panel determines that Omni owes Ravenna, say, $900,000 under the Ravenna/Omni Subcharter, and further determines that Ravenna owes Morfini $800,000 under the Morfini/Ravenna Head Charter, then it would seem that the $800,000 in the Court's registry would go to satisfy Morfini's lien, as opposed to Ravenna's in personam claim against Omni.  Ravenna may still seek enforcement of its award for $100,000 (the amount Omni owed to Ravenna net what Ravenna owes to Morfini), but satisfaction could not come from the $800,000 in the Court's registry.

In any case, Morfini has perfected its lien against a debt allegedly owed by Omni to Ravenna. Funds securing this debt are in the Court's possession.[15]  Therefore, Morfini's lien may attach to these funds, subject to the outcome of the London arbitration. Cf. W. Bulk Carriers (Australia) Pty. v. P.S. Int'l, Inc., 164 B.R. 616, 621-22 (S.D. Ind. 1994) ("We have found no authority suggesting that the source of a debtor's funds determines whether the funds are subject to maritime liens.  We hold that the existence of [the shipowner's] maritime lien [over subfreights and demurrage] does not depend on the source of the money satisfying

---

[15]  It should also be pointed out that Mount Shasta held there was in rem jurisdiction even though there was no property in the court's possession (hence the Owner's request for a monition against the Subcharterer).  The Court explained that, because the Subcharterer was within the power of the court, so was the debt; therefore the district court could order the Subcharterer to deposit the funds.  274 U.S. at 471.  Here, of course, the $800,000 is already in the Court's possession as a result of Ravenna's prior attachment.  Thus, the instant matter does not require the Court to stretch jurisdiction in nearly the same manner as occurred in Mount Shasta.

the debt but rather on whether the debt being satisfied is one commonly recognized as subject to maritime liens. . . . <u>Mount Shasta</u> does not suggest that the debt can only be collected from funds generated by the shipping transaction that produced the debt.").[16]

## C.   Rule B

A plaintiff is generally permitted to seek a writ of attachment and/or garnishment under Rule B either in addition to or in alternative of its in rem claim under Rule C.  <u>See</u> Fed. R. Civ. P. Supp. R. C(1).  To proceed under Rule B, (1) a plaintiff must have an in personam claim against the defendant that is cognizable in admiralty, (2) the defendant must not be found within the district in which the action is commenced, (3) the property

---

[16] One question lingers, however.  Cases after *Mount Shasta* described the vessel owner's lien on subfreights as "derivative" of the charterer's rights, <u>Hornbeck Offshore Operators, Inc. v. Ocean Line of Bermuda, Inc.</u>, 849 F. Supp. 434, 439 (E.D. Va. 1994), or that the lien clause amounts to an "assignment" of the debt owed to the charterer, <u>Biehl & Co., Inc.</u>, 693 F. Supp. at 465; <u>Saint John Marine Co. v. United States</u>, 92 F.3d 39, 48 (2d Cir. 1996), or that the owner is "subrogated" to the charterer's rights via the lien clause, <u>Cornish Shipping</u>, 53 F.3d at 504.  This might suggest that, if Ravenna could not arrest Omni's ship under Rule C (because Ravenna held no maritime lien against that ship), then Morfini similarly cannot arrest the funds that have taken the place of the ship.  In other words, if Morfini's rights are truly derivative of Ravenna's, then Morfini should not be able invoke Rule C where Ravenna could only invoke Rule B.  Under this theory, Morfini would only be able to attach the funds under Rule B.

The Court need not delve into such questions now.  As explained below, at a minimum it appears that Morfini may attach the funds under Rule B. Furthermore, as between Morfini and Ravenna, Clause 26 in the Morfini/Ravenna Head Charter would appear to give Morfini priority to the funds (assuming Omni is found to owe amounts under the Ravenna/Omni Subcharter), even if Morfini does not technically hold a maritime lien.  Thus, assuming no other party appears and asserts a claim to these funds, the Court will likely not need to determine whether Morfini's claim is technically in rem (Rule C) or only quasi in rem (Rule B).

belonging to the defendant is present or will be present in the district, and (4) there is no statutory or general maritime law prohibition to the attachment. Schoenbaum, <u>supra</u> note 2, § 21-2, at 521-22. There appears to be no dispute that elements (2), (3), and (4) are met. As to element (1), the Second Circuit has explained that when a vessel owner gives timely notice to the subcharterer that it is exercising its lien on subfreights, the vessel owner also acquires an in personam action against the subcharterer. <u>Saint John Marine Co.</u>, 92 F.3d at 44 (citing <u>Cornish Shipping</u>, 53 F.3d at 502). Therefore, after Morfini perfected its lien against Omni, Morfini had an in personam claim against Omni cognizable in admiralty (breach of a maritime contract), allowing it to invoke Rule B against the $800,000 in the Court's registry. Like the Rule C analysis, however, this is subject to the findings of the London arbitration.

CONCLUSION

For the foregoing reasons, the Court will grant Morfini's motion insofar as it seeks to arrest and attach the $800,000 in the Court's registry pursuant to Admiralty Rules C and B. The Court does not consider Morfini's motion insofar as it seeks to attach, sequester, and/or garnish these funds under Louisiana law and, accordingly, will deny without prejudice Morfini's motion in this regard. Accordingly,

**IT IS ORDERED** that (Rec. Doc. 42) Morfini's Ex Parte Motion

20

for Issuance of Maritime Law Rule B Writs of Attachment and garnishment, Rule C Warrant of Arrest and Louisiana State Law Writs of Attachment, Sequestration and Garnishment and to Appoint Undersigned Counsel to Serve Same is **GRANTED IN PART** and **DENIED IN PART, WITHOUT PREJUDICE**, as follows:

**IT IS ORDERED** that the $800,000 previously deposited in the Court's registry by Omni (as security for the release of the M/V STELLA BECRUX) and subject to Ravenna's attachment under Admiralty Rule B in Case No. 13-127, is, by effect of this Order, hereby **ARRESTED** by Morfini pursuant to Admiralty Rule C;

**FURTHER ORDERED** that the $800,000 previously deposited in the Court's registry by Omni (as security for the release of the M/V STELLA BECRUX) and subject to Ravenna's attachment under Admiralty Rule B in Case No. 13-127, is, by effect of this Order, hereby **ATTACHED** by Morfini pursuant to Admiralty Rule B;

**FURTHER ORDERED** that Morfini's requests for Louisiana writs of attachment, sequestration, and/or garnishment are **DENIED WITHOUT PREJUDICE**.

Finally, because the property subject to Morfini's arrest and attachment is already within the custody of the Court, it is unnecessary for the Clerk of Court to issue a warrant for arrest, writ of attachment, or other process. <u>Cf.</u> Fed. R. Civ. P. Supp. R. C, Advisory Committee Notes on 1966 Adoption, Subdivision (3) ("In such cases [where the owner of a vessel under charter has a lien on

subfreights] it would seem that the order to the person holding the fund is equivalent to original process, taking the place of the warrant for arrest.").   This, of course, does not relieve Morfini of any notice obligations, etc., that may apply under Rule B(2), Rule C(4), Rule 4, or any other law.

Signed in New Orleans, Louisiana, this 15th day of May, 2013.

United States District Judge